IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

    *Plaintiff*,

    v.

DAHEEM BRYANT-ROYAL,

    *Defendant*.

Criminal Action No. ELH-12-0040

Related Civil No.: ELH-16-2891

**MEMORANDUM OPINION**

This Memorandum Opinion addresses a Motion To Vacate, Set Aside, Or Correct Sentence filed by counsel on behalf of Daheem Bryant-Royal, Petitioner, pursuant to 28 U.S.C. § 2255. ECF 166.[1] The petition, is supported by a memorandum. ECF 168. Petitioner subsequently supplemented his petition with an affidavit. ECF 175-1. And, he also filed a second supplement. ECF 201. I shall refer to ECF 166, ECF 168, ECF 175-1, and ECF 201 collectively as the "Petition," unless otherwise noted.

In his Petition, Bryant-Royal asserts claims of ineffective assistance of counsel in connection with his trial on sex offenses involving a 15-year-old female, in violation of 18 U.S.C. § 2242(2) and § 2243. The events in issue occurred at a party held on a military base on September 4, 2011, attended by the victim, M.J., and Petitioner, who was then 21 years of age. According to Petitioner, "not since the Germans scuttled the Bismarck in 1941 . . . has a party been this effective at sinking his own ship." ECF 168 at 8 n.1.[2]

---

[1] The case was initially assigned to Judge William D. Quarles, Jr. It was reassigned to me on August 17, 2016, due to Judge Quarles's retirement. *See* Docket.

[2] Because the events at issue occurred on a military base in Maryland, the case arose under the Special Maritime and Territorial Jurisdiction of the United States.

The government opposes the Petition. It has filed several responses, with exhibits, docketed at ECF 173, ECF 187, and ECF 202. I shall refer to the responses collectively as the "Opposition," unless otherwise noted.

The Court held an evidentiary hearing on the Petition on January 18, 2019. ECF 204.[3] Post-hearing submissions were filed by Petitioner (ECF 207) and the government. ECF 208.

For the reasons that follow, I shall deny the Petition.

## I.    Procedural Background

Defendant was initially indicted on January 25, 2012 (ECF 1) and charged only with sexual abuse of a minor, under 18 U.S.C. § 2243. A Superseding Indictment followed on March 28, 2012 (ECF 15), adding a charge of sexual abuse, in violation of 18 U.S.C. § 2242(2).

Prior to trial, and continuing during trial, defense counsel filed numerous motions and responses. *See*, *e.g.*, ECF 14; ECF 27; ECF 28; ECF 29; ECF 30; ECF 31; ECF 37; ECF 39; ECF 40; ECF 47; ECF 48; ECF 49; ECF 50; ECF 51; ECF 58; ECF 60; ECF 65; ECF 87; ECF 91; ECF 94. By Memorandum (ECF 52) and Order (ECF 53) of August 6, 2012, Judge Quarles granted defendant's motion (ECF 27), seeking to dismiss Count Two of the Superseding Indictment.[4]

A Second Superseding Indictment followed on August 2, 2012. ECF 55. Petitioner was charged with two sexual offenses involving M.J. In Count One, he was charged under 18 U.S.C.

---

[3] On May 2, 2018, I scheduled the post-conviction hearing for July 5, 2018. *See* Docket. However, due to an unanticipated conflict between Petitioner and his former post-conviction lawyer, Petitioner's counsel sought to withdraw from the case. ECF 193; ECF 195. I granted that request. ECF 197. As a result, new counsel was appointed for Petitioner (ECF 199), and the hearing had to be rescheduled.

[4] The district court held motions hearings on September 21, 2012 (ECF 68); December 10, 2012 (ECF 92); and December 11, 2012. ECF 95.

§ 2243 with sexual abuse of a minor by vaginal and anal penetration with his penis. In Count Two, the defendant was charged with sexual abuse of a person "incapable of declining participation in and communicating unwillingness to engage in that sexual act, due to being under the influence of alcohol, physically ill and in and out of consciousness," in violation of 18 U.S.C. § 2242(2). The events occurred on or about September 4, 2011, at the Fort George G. Meade Military Base. As noted, M.J. was 15 years old at the time, and the defendant was 21 years of age.

The case proceeded to a five-day jury trial before the Honorable William D. Quarles, Jr., beginning on December 10, 2012. Defendant was represented by retained counsel, Joseph Owens. On December 18, 2012, the jury returned a verdict of guilty as to Count One, charging sexual abuse of a minor, but it was unable to reach a verdict as to Count Two, charging sexual abuse of an incapacitated person. *See* ECF 108. Count Two was subsequently dismissed. ECF 163 at 9.

The defendant appeared for sentencing on August 14, 2013. ECF 123. According to the Amended Presentence Report ("PSR", ECF 126), the defendant had a total offense level of 38. *Id.* ¶ 30. Notably, although Petitioner was not convicted of Count Two, his guidelines were calculated based on the "relevant conduct" that was at issue in that count. *See* ECF 160 (Sentencing Transcript), at 4-16, 29; *see also* ECF 119 (Government's Sentencing Memorandum) at 8-20. Therefore, in calculating the defendant's offense level, the PSR reflects application of the Cross Reference at U.S.S.G. § 2A3.2(c), with a base offense level of 30, under U.S.S.G. § 2A3.1(a)(2). *See* ECF 126, ¶ 23. Four levels were added under § 2A3.1(b)(1), because the offense involved conduct under 18 U.S.C. § 2241. ECF 126, ¶ 24. Two levels were added under § 2A3.1(b)(2)(B), because of the age of the victim. ECF 126, ¶ 25. And, two more

levels were added under § 2A3.1(b)(4)(B), because the victim "sustained serious bodily injury." ECF 126, ¶ 26. As the defendant had no prior offenses, his criminal history category was I. ECF 126, ¶ 35.

The advisory sentencing guidelines of 180 months' incarceration corresponded to the statutory maximum of 15 years' imprisonment. *See* ECF 126, ¶ 41 (citing U.S.S.G. § 5G1.1(a)). However, the government recommended a sentence of 120 months' imprisonment. ECF 160 at 16. And Judge Quarles imposed that sentence as to Count One. ECF 124; ECF 125

Thereafter, the defendant filed a Notice of Appeal. ECF 127. However, the United States Court of Appeals for the Fourth Circuit dismissed the appeal for failure to prosecute. ECF 133 (Order); ECF 134 (Mandate).

Bryant-Royal subsequently filed a Motion to Vacate under 28 U.S.C. § 2255 (ECF 136, "Motion"). In that Motion, Bryant-Royal sought the opportunity to file another appeal. In response, the government indicated its belief that "the appropriate relief is to reinstate Petitioner's right to appeal . . . ." ECF 138 at 2. By Order of April 21, 2014, Judge Quarles granted the Motion. ECF 141. An amended judgment followed (ECF 142), and Bryant-Royal noted another appeal to the Fourth Circuit. ECF 144.

On appeal, Petitioner presented the following claims: 1) the prosecutor's comments during closing argument about the defendant's out-of-court statements, which were not in evidence, deprived Bryant-Royal of his constitutional right to a fair trial; 2) defense counsel made inappropriate, inflammatory, and prejudicial remarks during closing argument, which deprived Petitioner of the effective assistance of counsel; and 3) the district court erred by admitting into evidence the testimony of defendant's former girlfriend, as well as phone records showing text messages and phone calls between them on the night of the incident. ECF 163 at 5.

In an unpublished, per curiam opinion dated February 27, 2015, the Fourth Circuit affirmed Petitioner's conviction. *See* ECF 163; *see also United States v. Bryant-Royal*, 607 Fed. App'x 258 (4th Cir. 2015) (per curiam).[5] The mandate followed on June 12, 2015. ECF 164. Bryant-Royal did not file a petition for certiorari to the Supreme Court. ECF 168 at 5.

Thereafter, on August 16, 2016, through appointed counsel, Bryant-Royal filed his Petition under 28 U.S.C. § 2255 (ECF 166), supported by a memorandum filed on September 13, 2016. ECF 168. The government opposed the Petition. ECF 173. Bryant-Royal did not file a reply, and the time to do so expired.

After review of the submissions, I held a telephone conference with counsel on October 5, 2017.[6] As a result of the discussion, on October 24, 2017, Petitioner filed a motion to supplement his Petition (ECF 175), along with his Affidavit (ECF 175-1), providing sworn allegations concerning his claims with respect to plea negotiations.[7] In particular, the Affidavit pertained to Petitioner's claims that trial counsel failed to engage in plea negotiations; failed to explain the federal sentencing guidelines; and failed to review the evidence with Petitioner. *Id.* Another supplement followed on December 4, 2018. ECF 201. The government responded on January 13, 2019. ECF 202.

---

[5] The Fourth Circuit did not address the merits of the ineffective assistance of counsel claim. ECF 163 at 13-14.

[6] During the conference, the Court asked counsel to provide courtesy copies of the Joint Appendix and the Supplemental Joint Appendix, which had been submitted on appeal.

[7] Previously, the submissions of Petitioner did not contain any sworn statements to this effect.

## II.  Factual Summary

As noted, trial began on December 10, 2012.  In opening statement, defense counsel told the jury that the defendant would probably testify.  *See* Joint Appendix ("JA") at 31.  But, the defendant did not do so.

At trial, the government presented the testimony of twelve witnesses.  These included the victim, M.J.; three witnesses who attended the party with Petitioner and M.J.; a DNA expert; a toxicologist; a nurse; a physician; an Army official; the defendant's former girlfriend, who testified about repeated calls she received from the defendant on the night in question; FBI Special Agent Kathleen Beaton; and an official from Verizon Wireless, who testified about cell site information and the defendant's cell phone usage at the relevant time.

The defense called three witnesses:  Thomas Chase, a defense investigator; Special Agent Beaton; and Suzanne Rotolo, Ph.D, a licensed practical nurse who specializes in forensic nursing.

M.J. testified that, at the party on the night in question, she was "[r]eally drunk" and "couldn't walk . . . ."  Supplemental Joint Appendix ("SJA") at 92.  She recalled that while she was "puking" at the toilet, *id.* at 93, defendant entered the bathroom.  *Id.* at 94.  According to M.J., defendant penetrated her anally and vaginally and performed oral sex on her.  *Id.* at 96-98.  M.J. insisted that several times she told the defendant to stop.  *Id.* at 96-97.

In addition, the government presented evidence that defendant was aware of M.J.'s age.  M.J. testified that defendant asked M.J. her age, and M.J. told defendant that she was 15 years old.  *See* JA at 72.  Alleyah Jones also testified that, on the night in question, defendant asked Jones M.J.'s age, and Jones told defendant that M.J. was 15.  JA at 99.  The government also presented evidence that defendant was aware of M.J.'s intoxication.

Forensic evidence presented at trial was consistent with sexual intercourse. Moreover, semen was recovered from the victim, and the DNA in that biological material matched defendant's DNA. *See* ECF 119 at 6. Expert testimony was also presented that established that M.J.'s injuries were consistent with "nonconsensual acute penetrating blunt force sexual trauma." SJA at 270; *see also id.* at 292.

The defendant did not dispute that he had sexual intercourse with M.J. ECF 168 at 5. Rather, the defense claimed that the sexual intercourse was voluntary and that the defendant reasonably believed that M.J. was over the age of 15. *Id.*

In regard to the facts at trial, I quote below from portions of the Fourth Circuit's factual summary, ECF 163 at 5-8.

> On September 4, 2011, Bryant-Royal, who was 21 years old at the time, attended a party with a group of teenaged acquaintances who lived at a military base in Maryland (the "Base"). Prior to the party, Bryant-Royal made plans to meet his ex-girlfriend after the party. During the evening, Bryant-Royal stated his intention to "get some tonight." SJA 170.

> The party guests included M.J., who was 15 years old at the time. M.J. consumed alcoholic beverages at the party. When the guests decided to leave the party, she required assistance walking to the car, and vomited multiple times during the drive back to the Base. Over the course of the drive, Bryant-Royal, also in the car and expressing frustration that the trip was taking too long, made several unsuccessful attempts to call his ex-girlfriend. She eventually answered his call, but said that she would not see him that night because he would be returning to the Base too late.

> The group returned to the Base and dropped off Bryant-Royal before driving to another guest's house. M.J. was carried into the house and left near a toilet. Shortly thereafter, Bryant-Royal arrived at the house. A member of the group testified that Bryant-Royal was agitated because he had not been able to meet his ex-girlfriend. J.A. 97. After a time, everyone at the house except for Bryant-Royal and M.J. went to bed. They awoke to find M.J. crying in the living room, her hair and clothes disheveled. M.J. stated that Bryant-Royal had raped her. Her friends took her home, and M.J. reported the sexual assault to her parents and law enforcement officials. Forensic evidence confirmed that sexual intercourse had taken place between M.J. and Bryant-Royal.

***

[T]he prosecution introduced the testimony of M.J. and a friend of hers, each of whom testified about a different conversation in which Bryant-Royal asked about M.J.'s age and was told that she was 15. JA 72, 99.

***

Bryant-Royal's defense for Count Two centered on the theory that M.J. consented to the sexual act and, fearing pregnancy or other consequences, concocted the rape allegation. By contrast, the government sought to prove that Bryant-Royal's conduct was knowing because it was motivated by his anger at not getting back in time to meet his ex-girlfriend. To prove this theory, the government offered the testimony of Bryant-Royal's ex-girlfriend to establish Bryant-Royal's state of mind directly before the assault. She testified that on the night of the offense, Bryant-royal called her approximately nine times. The government also introduced into evidence phone records showing text messages and phone calls between the two on the night of the offense.

Additional facts are included in the Discussion.

### III.    Standard of Review

#### A.

Pursuant to 28 U.S.C. § 2255(a), Petitioner may "move the court which imposed the sentence to vacate, set aside or correct the sentence," but only on certain grounds: "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. . . ." *See also United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015).

Collateral attack is not a substitute for direct appeal; failure to raise certain issues on direct appeal may render them procedurally defaulted on post-conviction review. *United States v. Frady*, 456 U.S. 152, 165 (1982); *accord Bousely v. United States*, 523 U.S. 614, 630 (1998). As a general rule, a petitioner who fails to raise a claim on direct appeal is barred from raising the claim on collateral review. *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 350–51 (2006).

However, this bar generally does not apply to claims pertaining to ineffective assistance of counsel. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 503–04 (2003).

Under 28 U.S.C. § 2255(b), a post-conviction hearing is generally "required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve this issue." *United States v. Robertson*, 219 Fed. App'x 286, 286 (4th Cir. 2007); *see also United States v. Ray*, 547 Fed. App'x 343, 345 (4th Cir. 2013). This is such a case. Therefore, the Court held an evidentiary hearing on January 18, 2019. ECF 204.

At the hearing, the government presented the testimony of one witness: Petitioner's trial counsel, Joseph Owens. Petitioner did not present any witnesses.

## B.

The Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, ____ U.S. ____, 137 S. Ct. 759, 775 (2017). Ineffective assistance of counsel is a well recognized basis for relief under § 2255. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Winbush*, ___ F.3d ___, 2019 WL 1770010, at *2 (4th Cir. April 23, 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017).

First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 2019 WL 1770010, at *2; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013). As the *Padilla* Court said, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task."

The first prong is known as the "performance prong," which relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Powell*, 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

As the Supreme Court recently reiterated, the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775; *see also Powell*, 850 F.3d at 149. "The lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 137 S.Ct. at 775 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). Notably, "the *Strickland* standard must be applied with scrupulous care," *Richter*, 562 U.S. at 105, and "the standard of judging counsel's representation is a most deferential one." *Id.* Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d

987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court...to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## IV.    Discussion

Petitioner contends in his submissions that his retained attorney "committed several egregious errors" that had "no strategic grounding and [were] the result of incompetence." ECF 168 at 13. In this regard, he complains that his lawyer failed to engage in plea negotiations. He also points to defense counsel's failure to abide by the representation he made in his opening statement to the jury concerning testimony from defendant. Further, he claims that defense counsel presented witnesses that hurt the defense. And, Petitioner maintains that, during closing argument, defense counsel used shocking, inflammatory, and offensive language that prejudiced the defendant.

At the hearing, Petitioner's counsel told the Court that two issues were "in play." One concerned the matter of plea bargaining, and the other concerned trial counsel's opening and closing arguments. Petitioner's counsel advised that he would submit on the plea issue. As to the argument of defense counsel, Petitioner complains about the "outrageous" performance of defense counsel, particularly in regard to his closing argument in such a "close case."

### A.

### 1.

Although Petitioner has submitted on his claim regarding plea negotiations, the claim was not formally withdrawn. Therefore, I must address it. In sum, the contention has been refuted

by exhibits produced by the government, and by the uncontradicted, credible testimony of defense counsel.[8]

"The negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla*, 559 U.S. at 373; *see also Frye* 566 U.S. at 143-44; *Hill*, 474 U.S. at 57. Nevertheless, a defendant has "no right to be offered a plea . . ." *Frye*, 566 U.S. at 148. Rather, if one is offered, the defendant "has the right to 'effective assistance of counsel in considering whether to accept it." *Lafler*, 566 U.S. at 168.

Clearly, "it is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement." *Libretti v. United States*, 516 U.S. 29, 50 (1995). And, "prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction or more serious charges or the imposition of a more severe sentence." *Lafler*, 566 U.S. at 168.

The two-part test set forth in *Strickland*, 466 U.S. 668, applies to plea bargaining. A petitioner can make a claim for ineffective assistance of counsel if he can "show that there is a reasonable probability" that "the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. Specifically, "a defendant must show that but for the ineffective assistance of counsel there is a reasonable probability that the plea offer would have been presented to the court … , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed." *Id*.

---

[8] The Court does not have the benefit of a transcript of the hearing on January 18, 2019. Therefore, in referencing the testimony of Mr. Owens, I have relied on my own notes. Although I have quoted some of the testimony, I cannot say that the quotations are absolutely accurate.

In *Frye*, 566 U.S. at 143, the Supreme Court underscored the "reality" that "plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process. . . ." Similarly, in *Lafler*, 566 U.S. at 170, the Court observed that our criminal justice system "is for the most part a system of pleas, not a system of trials." Thus, the *Frye* Court expressly stated that "criminal defendants require effective counsel during plea negotiations. 'Anything less . . . might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him.'" 566 U.S. at 144 (citation and some internal quotations omitted).

To be sure, the *Frye* Court recognized the role of "personal style" with respect to negotiation tactics. *Id.* at 145. Thus, it observed that "it may be neither prudent nor practicable to try to elaborate or define detailed standards for the proper discharge of defense counsel's participation in the process." *Id.* However, the Court's holding was clear: a defense lawyer "has the duty to communicate formal offers from the prosecution . . . ." *Id.* at 145. In that case, defense counsel rendered ineffective assistance by failing to allow the defendant to consider the plea offer before it expired. *Id.*

*Lafler*, 566 U.S. at 163, also provides guidance. There, the petitioner claimed that ineffective assistance of counsel led him to reject a plea offer. Although the attorney disclosed the plea offer to the defendant, defense counsel's advice to reject it fell below the standard for competent assistance of counsel. *Id.* at 160. In that circumstance, said the Court, "a defendant must show the outcome of the plea process would have been different with competent advice." *Id.* Put another way, "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability . . . that the defendant would have accepted the plea and . . . that the

conviction or sentence, or both, under the offer's terms would have been less severe" than what was imposed. *Id.* at 164.

The *Lafler* Court rejected the contention that a fair trial remedies any such errors, stating: "Far from curing the error, the trial caused the injury from the error." *Id.* at 166. This was because the defendant received a sentence substantially more severe than what he likely would have received had he pleaded guilty. *Id.*

**2.**

According to Bryant-Royal, his trial lawyer made "little to no effort at plea negotiations." ECF 168 at 3; *see also* ECF 175-1. Petitioner complains that his trial attorney "failed to engage in meaningful plea negotiations" and, "given the nature of the evidence against him and the significant penalties that could (and did) accrue as a result of trial, [he] would have resolved the case through a plea rather than a trial." ECF 168 at 3-4. Further, Petitioner asserts that he never knew the terms of a plea offer and that "there were no genuine, substantive plea negotiations . . . ." ECF 168 at 17.

Petitioner also complains that his lawyer failed to advise him of the "potential to avoid guideline enhancements" through a guilty plea. ECF 168 at 17. Nor was he advised "that, upon a conviction after trial, that the sentencing court would consider all conduct presented at trial," even if it did not result in a conviction. *Id.* He asserts that he "was led to believe, prior to choosing a trial, that he could only be sentenced for conduct he was convicted of." *Id.* at 21. In other words, petitioner insists that he "was unaware that, even if he was acquitted of [Count Two,] alleging an incapacitated victim, he could still be sentenced pursuant to facts alleged in support of that count at trial." *Id.* In other words, Petitioner maintains that, "[h]ad he been made aware of this crucial fact, he would have accepted a plea offer . . . ." *Id.*

Further, Petitioner maintains that defense counsel had a duty to explain to the defendant the "implications of losing at trial versus entering a plea of guilty," in order for the defendant "to make an informed decision" as to whether to pursue a guilty plea. *Id.* at 19. According to Petitioner, defense counsel failed to do so. *Id.* at 20.

In his Affidavit filed on October 24, 2017 (ECF 175-1), Petitioner asserts that he asked his attorney to negotiate a plea offer but his lawyer "never talked to [him] about any negotiations" and never showed him "a written plea offer." *Id.* at 1. In addition, Petitioner complains that his lawyer never explained the sentencing guidelines to him, the benefits of "'acceptance of responsibility,'" or that, "by going to trial [he] would face more incarceration time than if [he] pled prior to trial." *Id.*

Petitioner also claims that he asked his lawyer to inquire about a plea offer that would avoid the requirement of registration on the Sex Offender Registry. ECF 168 at 14; ECF 175-1 at 1. Although defense counsel stated he would do so, Petitioner asserts "that was the last Petitioner ever heard about the issue." ECF 168 at 14; *see also* ECF 175-1.

In addition, Petitioner claims that his attorney never explained "the high likelihood of conviction, given the evidence . . . ." ECF 175-1 at 1. And, he avers that, if "the risk of trial" had been "thoroughly explained" to him, he "would have accepted a plea offer," *id.* even if he had to register as a sex offender. *Id.* Petitioner acknowledges that he heard about a "formal offer" when the government told the Court about it. *Id.* But, he maintains that the terms were not presented and he never rejected it. *Id.* at 2.

Emphasizing the central role of plea bargaining in our criminal justice system, Petitioner suggests that counsel's errors are glaring. In his view, these kinds of omissions are akin to the ineffective assistance at issue in *Padilla*, 599 U.S. 356, when the defense attorney failed to

advise his client of immigration consequences.  ECF 168 at 17.  Notably, Petitioner contends that "effective plea negotiations would have resulted in a far less significant sentence."  *Id.* at 21.

Petitioner points out that, if he had been sentenced only under the statutory rape guidelines, the resulting guidelines range would have been 41 to 51 months of incarceration. ECF 168 at 20.  At the very least, Petitioner claims that he would have received three deductions for acceptance of responsibility.  *Id.* at 20.[9]

The government vigorously disagrees with defendant's contentions.  It points to ECF 9, "Joint Motion to Exclude Time Under the Speedy Trial Act."  ECF 173 at 10.  That motion states, in part:  "[D]efense counsel has indicated that a plea resolution may be possible.  The government will provide a proposed plea agreement to the defense for consideration."  *Id.* at 2. Because of "the possibility of plea negotiations," and for other reasons, counsel jointly sought to exclude time under the speedy trial clock.  *Id.*

More significant, the government's assertion is supported by a proposed plea agreement dated August 7, 2012, docketed as an exhibit at ECF 173-3.  In the proposed plea agreement, the defendant was to plead guilty to Count One of the Second Superseding Indictment.  However, the proposed plea agreement reflected a disagreement between the government and the defense as to defendant's offense level and the applicable sentencing guideline factors.  *See id.*, ¶ 10; ¶ 11; ¶ 12.

Under the government's analysis, the defendant had an offense level of 34 (not 38, as it argued at sentencing).  And, it agreed to two deductions (not three), under U.S.S.G. § 3E1.1. Therefore, the government claimed a final offense level of 32.  *Id.* ¶ 10.  However, the defendant

---

[9] Given the number of motions filed by the defense, coupled with the number of motions hearings, the government may not have moved for the third point deduction under U.S.S.G. § 3E1.1(b).

believed his final offense level was an 18. *Id.* ¶ 12. Therefore, the Court would have had to resolve the parties' disputes. *Id.* ¶ 6. Regardless, the government agreed to recommend a sentence within the guideline range resulting from an offense level of 32. *Id.* ¶ 15.[10]

According to the government, the plea offer was extended to Petitioner but rejected by him. Refuting Petitioner's claim that he was unaware of the plea offer, the government relies on Petitioner's arraignment on the Second Superseding Indictment, held on August 24, 2012. The transcript of that proceeding is included as an exhibit, docketed at ECF 173-2. At that hearing, at which a magistrate judge presided, the prosecutor expressly stated in the presence of the defendant, *id.* at 3: "I just want to put on the record very briefly in light of *Missouri v. Frye* and *Lafler v. Cooper*. That a written Pleas [sic] offer was extended on August 7, 2012, the defense counsel has informed the government that it has been considered and rejected." *Id.*

There was no reference to the particular terms of the proposed plea agreement. However, defense counsel never corrected the government's assertion.

Defense counsel submitted an Affidavit (ECF 187-1), in which he averred that he discussed with the defendant, "numerous times," the charges, the Sentencing Guidelines, and the "risks/benefits" of a guilty plea. *Id.* at 1. He also averred that he discussed the government's plea offer with the defendant, in the presence of his former law partner, Jonathan Crisp. *Id.* Further, he averred that he recommended to defendant that defendant "take the offer given the evidence against him, the possible penalties he was facing, and the uncertainty of trial." *Id.* at 2. However, defendant declined to accept the plea offer. *Id.*

---

[10] Notably, with a criminal history category of I and an offense level of 32, the guidelines would have called for a sentence ranging from 121 to 151 months of incarceration. And, as noted, defendant was sentenced to 120 months' incarceration.

Jonathan Crisp, Esquire also provided an Affidavit. ECF 187-2. He averred that he was present with Owens when Owens reviewed "the contours of the written plea agreement." *Id.* at 1. Moreover, he asserts that he and Owens "advised" the defendant to accept the plea, but defendant "wanted to proceed to trial." *Id.*

As noted, at the post-conviction hearing, the government called defendant's trial counsel as a witness. He testified, without contradiction, that on at least three occasions he discussed with defendant the pros and cons of pleading guilty. Moreover, counsel specifically testified that he met with the defendant to discuss the written plea offer provided by the prosecutor.

Further, Owens claimed he discussed the law and the facts with the defendant. In Owens's view, the defendant would not prevail at trial unless he testified, but Owens believed that testifying was not an option, because the defendant would be "torn apart" on cross-examination. According to Owens, this was because the defendant had "tried to mislead" military investigators as to the victim's age, and this would have been used to destroy the defendant's credibility.

Owens also testified that he and his partner recommended to the defendant that he accept the government's plea offer. Indeed, defense counsel's partner thought the defendant "could get slammed" at trial. Owens explained to the defendant that the plea agreement capped the defendant's exposure. But, according to Owens, the defendant was "adamant" that his interaction with M.J. was consensual, and he "wanted to go to trial." It was important to the defendant for everyone to know that "he would never force himself on anyone."

In addition, Owens testified that "SORNA was the first thing [he] talked about" with the defendant. Owens also maintained that he discussed the sentencing guidelines with the defendant, including that the court could consider evidence not addressed at trial.

According to Owens, he "tried a good case." Nevertheless, Owens believes now, as he did at the time, that the prosecution was "race based" and that the defendant got "a raw deal." Further, he maintained that the sexual conduct was consensual and the victim was not "a true victim," as she looked older than her age and, in his view, her claim of injury was "nonsensical."[11]

The defendant's comments at sentencing support the claims of defense counsel and the government that Petitioner insisted on going to trial. In his allocution, Petitioner said: "[T]he way I was taught, you just fight. If you believe in something, you fight, and that's exactly what I did, and that's to the end. I have no regrets about anything I did, about standing up here in front of you today, no regrets at all." ECF 173-4 (Sentencing Transcript excerpt), at 4. These comments are at odds with the Affidavit of Petitioner, asserting that he "would have taken the deal, to get home to [his] family." ECF 175-1 at 1.

Petitioner asserts that defense counsel "failed to discharge [a] very basic duty to Mr. Bryant-Royal. Had he done so, there exists the reasonable probability that the outcome of his case would have been different." ECF 168 at 15. As indicated, Petitioner alleges that he was never informed of the terms of the proposed plea offer, never rejected it, nor were the sentencing guidelines explained to him. ECF 175-1. However, Petitioner was aware by August 24, 2012, that there had been a plea offer. And, the testimony of Owens, which I find credible, completely

---

[11] Defense counsel advanced similar contentions at sentencing. He posited that the defendant "is here for two reasons. One is because of the color of his skin, and two is because he was on a military installation." ECF 160 at 22. And, Owens sought to refute any notion of the victim as "innocent." *Id.* at 24. He said: "It was 3 o'clock in the morning. She was out in the middle of the night without any parental supervision whatsoever . . . we have a promiscuous young lady out in the middle of the night doing what she does, engaging in sexual intercourse and drinking like a fish." *Id.* at 24-25. Defense counsel also claimed that the case – a statutory rape case – would not have "seen the light of day in a State Court." *Id.* at 23.

refutes Petitioner's claims that his lawyer failed to procure a plea offer and/or failed to explain the offer to him.

The proposed plea agreement contemplated a plea to Count One (statutory rape) and a dismissal of Count Two (sexual abuse of incapacitated persons). But, under the proposed plea agreement, the Court would have had the right to consider relevant, related conduct, and the plea agreement contemplated the government's presentation of evidence at sentencing concerning the victim's incapacitation. *See* ECF 173-3, ¶¶ 7, 9, 10. Therefore, the proposed plea agreement put the defendant on notice that the government intended to present evidence with respect to Count Two, concerning the victim's incapacitation, even if the defendant pleaded guilty only to Count One. ECF 173 at 11. And, that is the equivalent of what occurred.

As the government puts it, "Petitioner ended up in essentially the same position" after trial as he would have been if he accepted the plea offer that he claims not to have known about. ECF 173 at 12. That is, in effect, the precise result of the trial: a conviction on Count One and a dismissal as to Count Two.

Under the proposed plea agreement, defendant's final offense level was a 32, not a 38. But, even with a final offense level of 32, and a criminal history category of I, the guidelines range would have been 121 to 151 months. And, under the proposed plea agreement, the government agreed to recommend a sentence that corresponded to an offense level of 32. The government's ten-year recommendation after trial was consistent with the plea offer, even though defendant never accepted that plea offer.

In sum, Petitioner cannot establish that his attorney was ineffective for failing to engage in plea negotiations. Nor can he show "a reasonable probability that the end result of the

criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Frye*, 566 U.S. at 147.

**B.**

According to Petitioner, in his opening statement, "Trial counsel promised riches, and delivered rags." ECF 168 at 22. In opening statement, defense counsel stated, in part:

Will you hear from Daheem? . . .

Mr. Bryant-Royal is a college student in Anne Arundel County. If he testifies -- and he probably will. If he testifies, he will likely get confused, but he will be consistent. He will be consistent that he thought that [the victim] was older than 15 and she -- and he thought that the sex was consensual. It's what he's always said. That's what he said at the CID [Criminal Investigation Division].

ECF 155 (Transcript, Dec. 11, 2012), at 38.[12]

The government objected, but the Court overruled the objection. *Id.* at 39. Defense counsel then added, *id.*: "That's what he said to CID when he talked to CID. That's what he said to [Special Agent Kathleen] Beaton when he talked to Ms. Beaton. That's what he said to everybody: 'I thought that she was older than 15, and the sex was consensual. She initiated it.'"

Defense counsel continued, stating that the defendant "is a young man -- a young man who had never been in trouble. His mom is sitting behind him. She too is a service member. Mr. Bryant-Royal would be a service member today if it were not for these charges." Again, the government objected. *Id.* Again, the Court overruled the objection. *Id.*

Petitioner complains about the alleged representation by defense counsel in opening that the defendant would testify. He acknowledges that defense counsel "did not expressly promise his client's testimony . . . ." ECF 168 at 22. Nevertheless, he relies on cases in which courts

---

[12] The statement to CID, referenced by defense counsel, was never introduced into evidence. *See* ECF 168 at 22.

have found it objectively unreasonable for an attorney to promise the testimony of the defendant, only to break that promise. *Id.* According to Petitioner, the suggestion by defense counsel that he would testify was of "monumental importance." *Id.* at 24.

As Petitioner concedes, defense counsel never actually promised the testimony of the defendant. Thus, as the government has observed, "no promise was ever broken." ECF 173 at 13. Therefore, the cases on which Petitioner relies are inapposite.

Moreover, despite objections by the government, defense counsel utilized his opening statement to present to the jury favorable and sympathetic information about the defendant, as well as his defenses, without ever actually having to call his client, so as to avoid the rigors of cross-examination. In other words, defense counsel successfully employed a strategy that benefitted the defendant; through counsel's calculated opening statement, defense counsel "placed into the jury's mind his principal defenses" and exculpatory information. *Id.*[13]

Petitioner also complains that trial counsel referred to a recording of defendant's pretrial statement concerning his belief that M.J. was older than 15. ECF 168 at 24. But, "[t]he statement that counsel referred to in his opening was never submitted for admission into evidence, by either party." ECF 168 at 22; *see id.* at 24-25. Special Agent Beaton mentioned on cross-examination that the defendant provided a video statement. ECF 156 (Transcript, 12/12/12), at 207. But, she did not recount the content of the statement. *Id.* Indeed, she agreed that she could not "state unequivocally what happened[.]" *Id.* This claim is unavailing.

## C.

Petitioner complains that at trial defense counsel called only three witnesses, none of whom "testified in a manner favorable" to defendant. ECF 168 at 25. In particular, Petitioner

---

[13] I express no comment on the propriety of such a tactic.

asserts that Special Agent Beaton was questioned about prior inconsistent statements, but the statements were made by other witnesses, not Agent Beaton. Investigator Chase was called to demonstrate "the lack of cooperation from the government, regarding witnesses at trial." *Id.* But, Petitioner does not identify the way in which Chase's testimony actually harmed him. And, the evidence showed that the defendant had the requisite contact information. Defense counsel also presented the testimony of a forensic nurse, Dr. Suzanne Rotolo, who stated on cross-examination that the victim's "injuries were consistent with blunt-force, penetrating trauma." *Id.*

To be sure, Rotolo agreed that some of the injuries sustained by the victim were "consistent with blunt force, penetrating trauma." SJA at 274. But, she described "blunt force" as "just anytime an object that is blunt in shape has contact with tissue, causing an injury." SJA at 291. Moreover, Rotolo acknowledged that genital injuries may occur with consensual sex. SJA at 293.

Dr. Rotolo was asked: "Is it consistent with consensual intercourse?" SJA at 292. She responded: "It may be." *Id.* Moreover, she was asked, *id.*: "Any finding is problematic, correct?" She answered, *id.*: "That's correct." *Id.*

Upon review of the evidence presented at trial, it is clear that the evidence of defendant's guilt with respect to Count One was considerable. Therefore, as the government argues (ECF 173 at 13), Petitioner was not prejudiced.

**D.**

During closing argument, defense counsel said, in part: "You didn't hear from Daheem. I told you in the beginning you may or may not, and you didn't. College kid, United States Attorney -- not a good idea. You're going to get nervous, going to get confused. . . . See, he's already told you, 'I thought she was 16.'" ECF 202-1 at 34; SJA at 356; ECF 158 at 170.

The government objected, on the ground that the information was not in evidence. The objection was overruled. Defense counsel continued: "He told CID, 'I thought she was of age.' It's on tape. You didn't see the tape. Why not?" *Id.* The government objected, and again the trial judge overruled the objection. Defense counsel added, ECF 202-1 at 34-35; SJA at 356-57:

> Why didn't the Government show you the tape? Because then you would have Daheem saying, "I didn't do it. I thought she was 16. I thought she was older than she was. She told me she was 16." That's what you would have on the tape. So the Government doesn't show it to you, because they don't want you to see the tape.

> He also made a sworn statement -- sworn statement that says, "I thought she was older than she was. That's what everybody told me. That's what I thought. She was at a party. She was at a party. I thought she was older."

The government objected, and the Court overruled the objection.

Defense counsel managed to reference statements that were not in evidence, which were favorable to his client, without having to call the defendant as a witness. It was a calculated strategy that cannot reasonably be deemed to have harmed defendant. To the contrary, defense counsel successfully presented to the jury the defendant's version of events without ever calling the defendant. In other words, defense counsel pursued the defense that the defendant reasonably believed that M.J. was older than 15, without ever calling Petitioner.

In its Opinion, the Fourth Circuit observed, ECF 163 at 12, that "there was no evidence outside of defense counsel's improper statements at closing as to how old Bryant-Royal actually believed [the victim] was." This observation is telling. Defense counsel utilized statements not in evidence in an effort to establish the defense that Bryant-Royal reasonably believed M.J. was at least 16 years of age. Although defense counsel's remarks were improper, because they were not based on the evidence, the improper argument did not prejudice Petitioner.

**E.**

Petitioner's central focus concerns remarks by defense counsel in closing arguments that were allegedly "crude", "offensive", and prejudicial. ECF 168 at 28. Indeed, defendant asserts, ECF 201 at 7: "Simply put, defense counsel went off the rails."[14]

The right to the effective assistance of counsel extends to closing arguments. *Yarborough v. Gentry*. 540 U.S. 1, 5 (2003) (per curiam); *see Bell v. Clone*, 535 U.S. 685, 701-02 (2002). Closing argument is a vehicle that should be used to "sharpen and clarify the issues for resolution by the trier of fact." *Herring v. New York*, 422 U.S. 853, 862 (1975).

Judicial review of a defense lawyer's summation is "highly deferential . . . ." *Gentry*, 540 U.S. at 6. Nevertheless, Petitioner contends that trial counsel "muddled the water with a slew of distracting and obscene references" that were "outlandish." ECF 201 at 7. Indeed, Petitioner contends that Owens's argument was "so outside the realm of acceptability that the defendant was effectively denied the opportunity to present a closing argument to the jury." *Id.*

The government counters that the closing "was not constitutionally infirm." ECF 202 at 8. It characterizes defense counsel's "indecorous phrases" as occasionally "vulgar," but asserts that those were "few and fleeting." *Id.* at 9. The government points out that the entire 42-page transcript of the closing demonstrates a consistent theory of the defense: the victim looked and acted like an adult, engaged in consensual sex, and lied about the claim of rape because she regretted what had happened. *Id.* at 8. In its view, the defense attorney's presentation amounted to an effort to "humanize" the defendant and normalize what happened. *Id.* at 9.

With this framework, I turn to review some of defense counsel's remarks. At the outset of his closing argument, defense counsel urged the jury to "see through the facts." *See* ECF 202-

---

[14] The Fourth Circuit did not address this contention on appeal. *See* ECF 163 at 14.

1 at 1; *see also* ECF 158 (Transcript of August 18, 2014), at 137. He chastised the government

for characterizing the victim as "vulnerable" and "slight," stating that those "words [were] used

not for justice, but to anger [the jury]." *Id.* Later, he said, ECF 202-1 at 4; ECF 158 at 140:

"The real Mariah J. is not this pure, innocent, sweet little girl. The real Mariah J. is letting

loose . . . . She drinks all the time . . . ." And, Owens said, ECF 202-1 at 2; ECF 158 at 138:

> This isn't a case about a vulnerable victim; this is a case about incredible sex. A
> college kid and a high school girl, they get together, and they have sex.

Defense counsel also highlighted that the only two people who actually knew "what

happened" were the defendant and the complainant, both of whom "were drunk." *Id.* Defense

counsel sought to discredit the victim, stating, ECF 202-1 at 2-3; ECF 158 at 138-39:

> Two drunk kids had sex, but what does the evidence indicate what happened?
> Use your common sense. . . .
>
> ***
>
> Mariah J. goes out on a Friday night. She goes out. She drinks. She
> wants to go wild for the weekend. She's moving to West Virginia. Nothing that
> happens this weekend is going to even matter. She'll never be back. There is no
> repercussions. She does the same thing again on Saturday.
>
> On Saturday, she engages in sexual activity, and Saturday, semen gets
> inside of her. . . what makes sense? "I'm sorry for cumming in you. I'm sorry for
> ejaculating in you. I'm sorry for busting a nut." What happens is, "I'm sorry I
> busted a nut inside you." It's not nice language, but it's what happened. That's
> what happened that night. That's the only evidence that makes any sense.
>
> ***
>
> He ejaculated inside of her. Of course she's scared. She had semen inside
> of her. She's scared, so she comes up with a story . . . .

Defense counsel continued in his endeavor to discredit the testimony of the victim. He

said, ECF 202-1 at 6; ECF 158 at 142:

> Regret. Regret, members of the jury. Regret is not incapacitation. Regret
> is: I had sex with a guy. . . . I better make up something.

Defense counsel also disputed the government's account of a struggle in the bathroom, arguing that someone in the house would have heard it. ECF 202-1 at 10; ECF 158 at 146. He insisted that no one heard anything, "because the sex was consensual, and it was quiet, and then it went too far, and she regretted it." *Id.* Further, defense counsel argued, ECF 202-1 at 20; ECF 158 at 156: "Look, when people are drunk, they do stupid things. Daheem was drunk. Mariah was drunk. Their actions were stupid. Was she capable of appraising the nature of her acts? At the time she committed them? Yes."

Defense counsel also said, in part, ECF 202-1 at 10; ECF 158 at 146:

> Members of the panel, if you can't have sex with a sleepy person, might be in trouble. Sleepy? Really? She is sleepy, so that's incapacitation? No, that's not. Does that mean, when I come back from a long trip and wake my wife up that -- come on. That's ridiculous. Was she capable of appraising the nature of her acts? Not if it's something that she would do, but is she capable?

Mr. Owens also sought to explain the semen found on the victim's pants. He said, ECF 202-1 at 35-36; ECF 158 at 171-72:

> Sometimes when you're trying to come up with a story, you don't even have a good one, or what makes sense happened? He was inside of her. He started to cum. He tried to pull out. He got semen on her jeans because he pulled out late. That happens. It shouldn't happen. Wonderful things happen when that happens sometimes, because it's happened to me. It happens. Maybe I shouldn't share that information with you, but I love my daughter. It's a mistake.
>
> Sometimes -- sometimes when you mean to pull out, you don't do it in time, and semen goes inside. Sometimes you're the happiest guy in the world, and sometimes you're scared as hell . . . . The Judge is going to give you the instruction: If you reasonably -- if you reasonably believed she was 16. Well, why wouldn't it be possible that he reasonably believed she was 16? Well, because he bought what she was selling. . . . She has a fake ID.

And, he continued in his attempts to establish that the victim appeared older than 15 years of age. Owens argued, in part, ECF 202-1 at 37-38; ECF 158 at 173-74:

> Go ahead, look at her. . . . Look at her. She's 16. Right now, she's 16. She might even be 17 now. I don't remember. But, right now, she's over age. She's of the

age of consent. So it is reasonable that Daheem though that the person who looked a heck of a lot older than that was 16, see, because, a year ago, when she wasn't sitting in a courtroom, she had the tongue ring or the lip ring on, and she had the makeup on, and the clothes that were too tight and the jeans that were a tad too low. She looked older. She doesn't have alcohol in her hand now. She doesn't have a cigarette in one hand and alcohol in the other. That's what she had on September 4th.

This was 2 o'clock in the morning when he first met her. Would you let your daughter out at 2 o'clock in the morning on a Friday and Saturday night? Is that reasonable? . . .

*　　　*　　　*

She was at a party with an 18-year-old service member. Would you let your 15-year-old go to a service member's party on a Saturday night, Labor Day weekend? If you wouldn't do it, you can't expect her -- Daheem to think that someone else is. He thought she was 16. It's what's in his statement. It's what's on the video. Use your common sense.

In addition, defense counsel argued that the defendant reasonably believed the victim was

at least 16 years of age. He said, ECF 202-1 at 40-41; ECF 158 at 176-77:

I'm telling you Daheem thought she was 16, thought she was 17. He shouldn't have done it, but he thought she was older than she really was. It's what he thought, and he didn't rape her.

*　　　*　　　*

He came in her. He tried to pull out. That's why it's on her jeans. He regrets it.

Then, defense counsel said, ECF 202-2 at 40-41; ECF 158 at 176-77:

It's not me, not -- a beautiful thing happened because of a little lack of coordination. I struggle with closing arguments. . . . My mistake was the same. I came inside of a woman.

[PROSECUTOR]: Objection, Your Honor.

[DEFENSE]:　　　It's argument, sir.

THE COURT:　　　Improper argument. Sustained.

[DEFENSE]:　　　Members, imagine for a second that you ejaculate inside a woman --

[PROSECUTOR]:   Same objection.  Same objection.

[DEFENSE]:      -- when you don't mean to.

THE COURT:      Sustained.  It's the golden rule argument.  You can't make it.

[DEFENSE]:      Daheem's story -- and it rings true -- he ejaculated inside of a woman, and she made up a rape allegation.  It can happen.  Mistakes have consequences, but the consequence for this mistake isn't an unwanted pregnancy and maybe even an unwanted marriage -- it's jail, it's a sex offender, for something he didn't do.

Daheem was innocent of these charges. . . .

Defense counsel's closing argument consumed pages 137 through 178 of the transcript at ECF 158; *see also* ECF 202-1.  Petitioner focuses on crude and arguably offensive remarks made at various times during the closing argument.  He presents them in isolation, as if made all at once.

Although Petitioner claims that the inappropriate, lewd, and crude comments of defense counsel have nothing to do with the defenses concerning the victim's age or incapacitation, the remarks were made in support of the defense's claim that the victim fabricated the rape claim after the defendant accidentally ejaculated inside of her.  The argument of defense counsel was certainly tasteless and unnecessarily graphic.  But, there is no basis to conclude that defendant was prejudiced by it.  Indeed, as Owens pointed out, the jury hung on the more serious charge.

Owens explained at the post-conviction hearing that he aims to provide a "memorable" closing and to control the narrative.  He used "vernacular" language because he wants to talk to jurors the way people talk-not as lawyers and judges talk.  He tries "to connect" with jurors, and he was of the view that the jury did not "hold [his] statements against the defendant."  In his view, given the outcome for Count Two, he "won the case."

Moreover, he testified that after the trial the defendant's mother referred a client to him, and a juror even called him for representation. In addition, he maintained that his cross-examination of the victim was more important than his closing. He saw nothing wrong with the reference to the discussion of the conception of his own child, whom he identified as a "mistake."

Owens explained that the defendant was charged with forcible rape. He pursued the case on two fronts – as to the defendant's age and her incapacitation. He maintained that he achieved "the best result possible" because the defendant could have been found guilty of both charges or the more serious one. In his view, there was no chance for a complete acquittal unless the defendant testified, and the government had a video with a damaging statement by the defendant, which it would have used if the defendant had testified. Moreover, other witnesses said they had told the defendant the victim was only 15.

In *Gentry*, 540 U.S. 1, the Ninth Circuit had rebuked counsel for calling his own client a "bad person, lousy drug addict, stinkng thief, [and a] jail bird." *Id.* at 9. Yet, the Supreme Court said, *id.*: "This is precisely the sort of calculated risk that lies at the heart of an advocate's discretion. By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case."

Moreover, the use of coarse language is not inherently ineffective. *See United States v. Baldwin*, 987 F.2d 1432, 1438 (9th Cir. 1993) (concluding that a defense attorney did not render constitutionally deficient performance despite saying "bullshit" and "hell" during trial); *Rodriguez v. Hill*, No. EDCV 11-0166 VAP (SS), 2013 WL 1859188, at *20 (C.D. Cal. Mar. 6, 2013) (Segal, M.J.) (concluding that a defense attorney did not render constitutionally deficient performance, despite calling his client a "lying SOB" and saying "f**k" during closing

argument). Courts have also denied ineffectiveness claims where defense attorneys shared their own personal experiences with the jury, even where they may be distasteful. *Gentry*, 540 U.S. at 11 ("[T]here is nothing wrong with a rhetorical device that personalizes the [closing argument]. Winning over an audience by empathy is a technique that dates back to Aristotle."); *Tarter v. McCallister*, No. 2:14-CV-223, 2017 WL 4293188, at *8 (E.D. Tenn. Sept. 27, 2017) (concluding that a defense attorney representing an African-American client in a largely Caucasian county did not render constitutionally deficient performance, despite telling the jury that he, the defense attorney, sometimes uses "the N word").

I agree that counsel's presentation was distasteful. But, I cannot conclude that he was constitutionally ineffective.

The evidence as to the statutory rape charge was substantial, although defense counsel argued vigorously that defendant reasonably believed that M.J. was at least 16 years old. As to the sexual offense charge in Count Two, Owens made a strategic decision to explain defendant's conduct as consensual, and argued that the semen found on M.J.'s pants resulted from his attempt to withdraw. That Owens secured a hung jury as to the more serious of the two charges supports the view that the defendant was not prejudiced by his attorney's use of crude language.[15]

## IV. Conclusion

For the reasons set forth above, I shall DENY the Petition.

Unless a Certificate of Appealabilty ("COA") is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b). A COA

---

[15] The defendant, a young man who had a bright future, with no prior record, was sentenced as if he had been convicted of the more serious offense, despite the dismissal of that charge.

may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck*, 137 S. Ct. at 773. The petitioner "'must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong,'" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and quotations omitted), or that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

I shall grant a Certificate of Appealability. Although I am of the view that Petitioner is not entitled to relief on the basis of the closing argument, the issue is not a frivolous one, and a higher court may see it differently.

An Order follows, consistent with this Memorandum Opinion.

Date: April 30, 2019                    /s/_____
                                        Ellen L. Hollander
                                        United States District Judge